In May of 1926 John Murtland, hereinafter referred to as John, caused to be incorporated the Murtland Holding Company, the complainant in this case. The incorporators of the company were John, Dan Murtland and a Mr. Thompson. *Page 118 
Dan is John's nephew and Thompson had been and continued to be an accountant, having supervision over the accounts of John and the Holding Company.
The distribution of stock was four hundred and ninety-eight shares to John and one share each to Dan and Mr. Thompson. John was president, Thompson was secretary and Dan was treasurer. These three constituted the board of directors. The principal office of the company was that owned by John.
In July of 1932 Dan severed his connections and a Mr. Wells was elected in his place. Wells was and is a partner of Mr. Thompson, and also an accountant.
Without detailing the evidence, it sufficiently appears that John incorporated the Holding Company for the purpose of holding the assets of which John was either the sole owner or had sole control, and it further sufficiently appears that from the date of incorporation John had sole control of the assets of the Holding Company and that the other stockholders were what is commonly known as "dummies." Both Thompson and Wells testified that they never inspected the stock certificates or other assets of the company, nor did they ever have them in their possession.
Thus things stood in June of 1931, when John personally sought a loan of $12,500 from the defendant bank, with the result that John, having given collateral satisfactory to the bank, the loan was granted and the bank gave its check to John for the full amount requested, John having delivered with the collateral his personal note.
As a part of the collateral aforesaid, John delivered to the bank certificate B401 for three hundred and thirty-two shares of the stock of the Chelsea Title and Guaranty Company. The Murtland Holding Company was the owner of this certificate of stock. John delivered to the bank, with the certificate of stock aforesaid, a written assignment thereof, signed by the Holding Company through himself as president and Mr. Thompson as secretary. This assignment was in regular form, contained an irrevocable power of attorney and bore the corporate seal. The authenticity of the execution *Page 119 
of this assignment is not disputed but there is some dispute as to who filled in some of the written matter on the face of the assignment, i.e., whether it was filled in before or after delivery to the bank. This, I think, makes no difference, in view of the fact that no fraud is charged in connection therewith.
Just what happened between the time when John got the $12,500 as the proceeds of the loan aforesaid and the filing of the bill of complaint does not appear, i.e., what payments he made on account of principal and interest on the loan, nor is it important, in view of the issue before me, but it does appear that John was recently adjudicated a bankrupt and that thereafter, in January of 1937, the bank served notice on the Holding Company of the public sale of the certificate of stock aforesaid, so as aforesaid held by it as collateral security. Upon this action by the bank, the Holding Company filed its bill of complaint seeking to enjoin the sale and a decree that the bank deliver to the complainant the certificate of stock aforesaid.
The evidence on final hearing shows that the ownership of the certificate of stock aforesaid was, at the time of its delivery to the bank, in the Murtland Holding Company and not John Murtland; that John Murtland was the recipient of the moneys loaned and not the Murtland Holding Company, and that that company never received any of the proceeds thereof and that there never was any formal meeting of the board of directors of the Murtland Holding Company authorizing the execution of the assignment of the certificate of stock to the bank, in so far as the minutes of the Murtland Holding Company disclose, and that there is no minute of any meeting of the board of directors of the Holding Company before or after the assignment aforesaid authorizing it or ratifying its execution.
Thompson, in an affidavit used on the return of the order to show cause why ad interim restraint should not be granted, said he knew nothing of any such assignment and that, in fact, there had never been an assignment of the certificate of stock executed by the officers of the company. At the final *Page 120 
hearing it appeared that Mr. Thompson was mistaken, for the fact appeared that he signed the assignment as an officer of the company. Wells says he never knew of the transfer of the stock and, of course, he did not. His advent as a stockholder was subsequent to the execution of the assignment, which assignment was executed at the time Dan Murtland was still a stockholder. Wells further says that he never had possession of or knew of the particular assets of the Holding Company.
Dan Murtland, as heretofore noted, was an officer and director of the Murtland Holding Company at the time the assignment was executed, and was not called as a witness, nor was his absence explained, even though John admits that the stock certificate bore a notation thereon "332 shares. Dan ask me," which notation is in the handwriting of John and as to which John admits he conferred with Dan.
We have, then, two of the officers of the Murtland Holding Company who actually signed the assignment of stock and the irrevocable power of attorney, who must have been acquainted with the details of the transaction, and the remaining officer, director and stockholder, who was to "ask me" (referring to John) not testifying, and the inference to be drawn is that Dan knew, by explanation from John, as to the details of the transaction under which the certificate of stock was assigned to the bank as collateral security for John's loan.
We have, therefore, all the stockholders, all the directors and all the officers of the Murtland Holding Company in possession of full knowledge at the time of the execution of the assignment of the aforesaid stock that (a) it was an asset of the complainant corporation, (b) that it had been assigned either in blank or otherwise, with power of attorney, (c) that it was to be used. Whether Dan and Thompson knew how it was to be used does not appear, but it is certain that John knew, and the inference is that John told Dan, and Thompson, having so far lost his memory of the transaction as to even forget the execution of the assignment as an officer of the Murtland Holding Company, must have *Page 121 
had knowledge of the purpose of the assignment when he executed it.
Thus it was that the Murtland Holding Company permitted the bank to loan to John $12,500 in faith of collateral belonging to the Murtland Holding Company and in faith of its duly executed assignment and power of attorney, under its seal, and now it says and asks this court to hold that the assignment was void because it was not authorized by the board of directors of the Murtland Holding Company, and that that body never had any knowledge thereof until January of 1937, when the bank served notice of sale, and hence never ratified the transaction.
Prior to John's bankruptcy he had disposed of his stock-holding interests in the Murtland Holding Company by assignments thereof through trustees to his family, and now has one share remaining in his name. Of course, complainant may not have any relief against John, nor may the bank, they being barred by the adjudication of bankruptcy.
It is apparent that the complainant now attempts to recover from the bank an asset which the Murtland Holding Company formerly owned, and that there is no intervention of equities in others that might interfere with this court entering a decree which will be equitable and just as between the parties, no rights of creditors intervene and no rights of innocent third parties. All this court is concerned with is what is right as between the Murtland Holding Company and the bank.
Of course, if the bank had demanded a resolution of the board of directors of the Murtland Holding Company prior to its granting the loan to John, its demand would have been complied with. John wanted the loan and he owned the Murtland Holding Company, and its dummy directors would have done his bidding. It is also apparent that at the time of the execution of the assignment and power of attorney two directors met (John and Thompson) and only one director was absent, and the two directors present represented four hundred and ninety-nine shares of the authorized stock, and the missing share was controlled by John, and after the execution *Page 122 
of the assignment, John advised the remaining shareholder as to the assignment.
The corporate form is as much recognized by equity as law and this court is bound by the laws governing the conduct of the corporate action, but where the corporate form is used as a shield behind which injustice is sought, equity penetrates the shield, casts it aside and does equity.
As said by Vice-Chancellor Garrison in Perkins v. TrinityRealty Co., 69 N.J. Eq. 723 (at p. 731); affirmed, 71 N.J. Eq. 304:
"When the rights of the state, the public and creditors are eliminated, and only the rights of stockholders are involved, the form of the fictional body termed a corporation does not hamper the court in the least in dealing with the rights of the parties. And that which the individuals composing the corporation might do, and will be held to have done among themselves, will be dealt with without regard to the immaterial fact that they were members of a fictional body."
For other cases to like effect, see Breslin v. Fries-BreslinCo., 70 N.J. Law 274; Murphy v. W.H. F.W. Cane, Inc.,82 N.J. Law 557; Whitfield v. Kern, 122 N.J. Eq. 332, wherein Mr. Justice Heher said (at p. 347):
"And so, an estoppel operating upon the stockholders binds the corporation, unless the rights of third parties are violated."
In Allen v. Wilson, 28 Fed. Rep. 677, cited with approval in the Fries-Breslin Case, supra, the court held:
"That a stockholder is estopped to object to corporate acts which were performed with his knowledge and assent, and that such assent might be implied from his long silence."
From the facts found by the court, as above set forth, it is clear that the officers, directors and stockholders of the Murtland Holding Company permitted to be delivered to the defendant bank the certificate of stock in question and that each and every one of them assented to its delivery for the use of John, with the result that the bank parted with a large sum of money which it may not recover, excepting as it realizes on the collateral pledged as security for the loan. *Page 123 
The stockholders and, through them, the corporation, are estopped and not entitled to relief.
Complainant, however, argues that the bank (a) knew that the Murtland Holding Company was a corporation; (b) that it knew the shares in question were the property of the corporation and not John Murtland; (c) that it knew the corporation owed it nothing and it knew that the certificate, on its face, stood in the name of the corporation and that it was taking the certificate of stock to secure the individual debt of the defendant Murtland.
It may be said at the outset that there is no evidence of any actual knowledge on the part of the bank as to any equities of the corporation in the certificate of stock in question and that the only knowledge the bank had was that which it obtained by an inspection of the certificate of stock, the assignment thereof and the power of attorney. This inspection revealed to the bank that the ownership of the stock resided in the corporation and the written assignment of the certificate revealed to the bank that the corporation, through its president and secretary, had executed an assignment thereof and that the same officers had executed the power of attorney and affixed the corporate seal thereto.
Unless the bank was put on inquiry by reason of the fact that the certificate of stock was issued in the name of the Holding Company, or was required to investigate whether Murtland had committed a fraud on the company by procuring the certificate of stock unlawfully, the bank had a right to accept the certificate as a pledge for Murtland's debt.
The general rule is well settled that the bank, in the absence of knowledge of fraud on the part of Murtland in procuring the assignment, and in the absence of knowledge of the lack of consent of the Holding Company to the transfer of the stock, was clothed with title to the stock upon its delivery by Murtland with the assignment and power of attorney.
Even prior to the Uniform Stock Transfer act of 1916, the court, in the case of Mt. Holly, c., Turnpike Co. v. Ferree,17 N.J. Eq. 117 (at p. 118), said:
"The certificate of stock, accompanied by the power of *Page 124 
attorney authorizing the transfer of the stock to any person, isprima facie evidence of equitable ownership in the holder, and renders the stock transferable by the delivery of the certificate. And when the party in whose hands the certificate is found, is shown to be a holder for value, and without notice of any intervening equity, his title as such owner cannot be impeached."
In the later case of Prall v. Tilt, 28 N.J. Eq. 479, the court held that:
"A certificate of stock accompanied by an irrevocable power of attorney, either filled up or in blank, is, in the hands of a third party, presumptive evidence of ownership in the holder. And where the party in whose hands the certificate is found is a holder for value, without notice of any intervening equity, his title cannot be impeached."
Subsequent cases to like effect are so numerous that citation is unnecessary.
In the above case, the certificate of stock in question was the property of an estate and the executrix thereof permitted her sons to pledge the stock with the defendant to secure advances made by the defendant to the sons. The evidence disclosed that the defendant knew that the stock had belonged to the testator in his lifetime and that at the time of the negotiation it still stood in testator's name on the books of the company, as appeared by the certificate of stock. This certificate, with the blank power of attorney for its transfer, duly executed by the executrix, was delivered by her son to the defendant and the defendant company filled in the name of the defendant in the power of attorney. The court held (at p. 483):
"By commercial usage, as universally acknowledged by the business community as the law of negotiable paper, and sanctioned by repeated adjudications in our courts as well as in those of other states, a certificate of stock accompanied by an irrevocable power of attorney, either filled up or in blank, is, in the hands of a third party, presumptive evidence of ownership in the holder."
The court further said (at p. 484) that: *Page 125 
"The fact that the legal title to the stock was known to have previously been in the executrix, and that the title of the holder appeared upon its face to have been derived from her in her representative capacity, does not affect the application of the principle or create any conflict" — with the foregoing principle.
The court further said (at p. 484):
"Mere knowledge on the part of a purchaser that an executor or administrator is dealing with the assets in a fiduciary capacity, is not enough to raise suspicion or to put the party on inquiry."
The instant case is different than that which would arise had the ownership of the stock as it appeared on the face thereof been in the name of Murtland as trustee, in which case it might well be that the bank would be put on inquiry and charged with notice. The true rule in such a case is that stated in Goodell
v. Monroe, 87 N.J. Eq. 328 (at p. 334):
"Where, on the face of the transaction, it is evident that the executor sells or pledges securities which belong to the estate as his own, and not as executor, the purchaser or pledgee deals with him at his own risk."
In Peckinpaugh v. H.W. Nobel Co., 238 Mich. 464;213 N.W. Rep. 859; 52 A.L.R. 941, it was held:
"In the eye of the law an endorsement in blank of a stock certificate is not a mere inquisitive bit of evidence calling for investigation of rights remaining with the endorser. The endorsement in blank gave power to any possessor of the certificates to pass title by delivery."
In Edmund Wright-Ginsberg Co., Inc., v. Carlisle RibbonMills, 105 N.J. Eq. 411, Vice-Chancellor Lewis held that:
"Pledgee, taking stock certificate as security in good faith, for value, and without notice from person who procured its delivery to him by fraud, acquired security title as good-faith purchaser under the Uniform Stock Transfer act (P.L. 1916ch. 191), giving stock certificates the attributes of negotiable instruments."
The Uniform Stock Transfer act provides, in section 1 thereof, the manner in which title to a stock certificate may be effectually transferred, and section 5 of that act provides: *Page 126 
"The delivery of a certificate to transfer title in accordance with the provisions of section one is effectual, except as provided in section seven, though made by one having no right of possession and having no authority from the owner of the certificate or from the person purporting to transfer the title."
Section 7 provides that if
"the certificate has been transferred to a purchaser for value in good faith without notice of any facts making the transfer wrongful,"
that then the title passes to the transferee, even though the certificate was procured by fraud or duress or without authority from the owner.
There being no proof of notice of any irregularity in the assignment or power of attorney in the instant case, the title to the certificate was and is in the bank and it was not required to make inquiry by reason of the fact that the face owner of the certificate (complainant corporation) did not present the certificate. Howison v. Mechanics Savings Bank (N.H.),183 Atl. Rep. 697 (at p. 702).
The face owner of the certificate of stock, the corporation, under its seal, assigned the certificate, and there was nothing either on the face of the certificate or attached assignment to indicate that the holder thereof (John Murtland) was not entitled thereto, and the seal of the corporation was, to the bank, presumptive evidence of a voluntary transfer of ownership from the corporation to Mr. Murtland. The bank had a right to rely on the corporate seal affixed to the assignment, which seal constituted prima facie evidence that it was affixed by proper authority. Leggett v. New Jersey Manufacturing and BankingCo., 1 N.J. Eq. 541; Manhattan Manufacturing, c., Co. v. NewJersey Stock Yard and Market Co., 23 N.J. Eq. 161.
Complainant relies, in part, upon Jackson v. Hooper, 76 N.J. Eq. 592,
and Jennings v. Studebaker Sales Corp.,112 N.J. Law 399, but a careful reading of these cases discloses that the doctrine of estoppel was not applicable.
The result is that an order may be entered dismissing the bill of complaint, with costs to the defendant. *Page 127